# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1886.

[No. 2038.]

21 1
30 128

21 1
37 278
39 514

### JAMES MARTIN v. THE STATE.

1. BURGLARY—INDICTMENT—CASE APPROVED.—Note the opinion for approval of the rule laid down in Carr's case, 19 Texas Court of Appeals, 635, to the effect that an indictment which charges that the accused did "break and enter" the house, but does not allege the breaking and entry to have been either by day or night, is sufficient to authorize a conviction for burglary, whether by day or night, if supported by proof that the force was applied to the building. See the statement of the case, in connection with the statement of Carr's case, *supra*, for evidence *held* sufficient to support both the indictment and the conviction.

2. PRACTICE—CHANGE OF VENUE.—The granting or refusing of an application for a change of venue is a matter committed to the sound discretion of the trial court. The action of the trial court upon such an application will not be revised on appeal, unless it should appear that such discretion has been abused. See the opinion *in extenso* for circumstances under which the trial court is *held* not to have exceeded its discretion in refusing an application for a change of venue.

3. QUALIFICATION OF A WITNESS—EXECUTIVE PARDON.—It is a well established doctrine that, "in the absence of fraud, a pardon will be good though it states the date of the conviction incorrectly if it was intended to cover, and does cover, the particular offense." The rule cannot be changed by the fact that the date of the conviction as recited in the pardon is a date upon which no legal conviction could be had. The question is purely one of identity, involving the competency of the witness to testify, and upon the trial judge alone devolves the determination of the question whether the pardon was intended to and did relate to the particular offense of which the witness was convicted, and, in determining this question, he is not confined to the record alone, but may hear evidence *dehors* the record. The record failing to show in any way that the State failed to show that the Hester named in the pardon was the same Hester named in the judgment of conviction, and that the conviction named in the pardon was the same conviction evidenced by the judgment, the presumption obtains that the necessary proof was made.

Statement of the case.

4. SAME.—The courts of this State have no control whatever over the motives which actuated the executive in bestowing a pardon upon a convict. If the pardon be valid upon its face, it must be given its full force and effect, as an instrument emanating from the Governor in the exercise of his constitutional authority. Objection, therefore, that the full pardon in this case was granted to avoid a former decision of this court holding a conditional pardon insufficient to restore the competency of a convict· as a witness is not well taken.

5. SAME.—That a previous conditional pardon was granted to and accepted by the convict cannot affect the validity of a full pardon subsequently granted to and accepted by him.,

6. SAME.—"Where, by the Constitution, a particular question is plainly addressed to the discretion or judgment of some one department or officer, the interference of any other department or officer, with a view to the substitution of its own discretion or judgment in the place of that to which the Constitution has confided the decision, would be impertinent and intrusive." Moreover, such interference is especially interdicted by Section 1 of Article 2 of our Constitution. It is, therefore, beyond the province of this court to decide whether or not the granting of a pardon to a person convicted of a felony, in order to qualify him as a witness in a particular case, is against public policy.

7. SAME—FACT CASE.—See the statement of the case in connection with the report of Carr's case, 19 Texas Court of Appeals, 635, for evidence *held* sufficient to support a conviction for burglary

APPEAL from the District Court of Gonzales. Tried below before the Hon. George McCormick.

This is the companion case to that of Carr v. The State, reported in full in volume nineteen of these Reports. A separate indictment charged this appellant with the same offense—the burglary of the store house of Samuel Brown and J. W. Peebles, in Gonzales county, Texas, on the tenth day of December, 1883. The appellant's trial resulted in his conviction, and his punishment was assessed at a term of four years in the penitentiary.

Of the witnesses who testified in Carr's case, Messrs. S. H. Brown, Swann, Ledbetter, Trammell, John Hester, B. and M. Lott, Alley, W. O. Jones, Clint, and Ed. Martin, Melvin, Ivey, Underwood, Mrs. Collins and Darnell, testified in this case substantially to the same facts as in Carr's case. Messrs. Carpenter, W. H. Brown, Deering, Sam Hester, Carr, the two McNabbs, McFarland, Alexander and Williams who testified in Carr's case, were not examined upon this trial. The additional testimony adduced upon the trial of the appellant is summarized below.

C. C. Littlefield testified, for the State, that he lived abut three miles distant from Leesville at the time Brown & Peebles's store was burglarized.   He had four hundred and eighty-five dollars on deposit with Brown & Peebles at that time.    It was the recollection of the witness that the money consisted of two one hundred dollar bills, one fifty dollar gold certificate, the larger part of the balance being in five dollar and ten dollar bills, and some silver.

Cross-examined, the witness said he was quite certain that there were two one hundred dollar bills in the amount of money deposited by him with Brown & Peebles.   Of the amount deposited by witness, four hundred dollars was in currency, in a paper box.   The remainder was silver in a common twenty-five-pound shot sack, unless Brown exchanged it for gold, which witness authorized him to do.   It was the recollection of witness that, on a former trial of this case, Brown testified that he was not positive that there were any one hundred dollar bills in the safe at the time of the burglary.

J. W. Peebles testified, for the State, that he was the Peebles of the mercantile firm of Brown & Peebles, of Leesville, Gonzales county, Texas.   That establishment was burglarized on the night of December 31, 1883, and thirteen hundred or fourteen hundred dollars was taken.   Witness had known the defendant for five or six years.   Defendant was well acquainted with Brown & Peebles.   The house was entered by removing a plank from the south side.

Cross-examined, the witness testified that the money taken consisted of silver in a cigar box and sacks, and currency in a Morocco pocket book, in five, ten, twenty and fifty dollar bills. He had no recollection of there being any one hundred dollar bills in the safe, though there may have been.   Witness reached the safe, in the street, about sunrise on the morning after the burglary, about the same time that Brown reached it.   He did not remember who else was about the safe.   An old account book belonging to Brown & Peebles was kept in the safe.   Witness saw nothing of that account book about the safe when he reached it on the morning after the burglary.   Pieces of the cigar box were strewn about the safe, and a paper thread box that was kept in the safe was lying near, in pieces.   The store house of Brown & Peebles was entered on that occasion without the witness's knowledge or consent.

J. M. Carraway testified, for the State, that he lived in Leesville, just east of Brown & Peebles's store, about seventy-five yards distant. Before breakfast on the morning after the burglary, witness saw Brown & Peebles's safe standing in the street, with a hole broken through it. Witness's axe was lying near the safe. That axe was left behind witness's shop over night. Witness had never heard the defendant say anything about the burglary.

Cross-examined, the witness testified that his axe was last used, so far as he knew, by B. L. Smith. Witness did not know the said Smith's present whereabouts. He left Leesville some eight or nine months after the burglary. Smith slept in the house in which he was doing business, in front of which was the wood pile, at which the axe was generally left.

John Hester was introduced by the State, and his competency to testify as a witness was attacked upon the ground that he had been convicted of an infamous crime. The State then read the charter of pardon granted by the Governor of the State of Texas, as follows:

"Proclamation of the Governor of the State of Texas.

"To all to whom these presents shall come: Whereas, at the November term, A. D. 1884, in the District Court of Gonzales county, State of Texas, John G. Hester was convicted of theft of sheep, and sentenced to five years confinement in the penitentiary; and whereas, the pardon heretofore (to wit, June 22, 1885), granted said convict by the Governor, because of its conditions, has been held by the Court of Appeals not to be a full pardon: Now, therefore, I, John Ireland, Governor of Texas, do, by virtue of the authority vested in me by the Constitution and laws of this State, hereby, for the reasons specified, now on file in the office of the Secretary of State, grant the said John G. Hester a full pardon, and restore him to his competency as a witness in the courts of this State.

          "In testimony whereof I have hereto signed my name,
[SEAL.]  and caused the seal of State to be affixed, at the city of
          Austin, this thirteenth day of January, A. D. 1886.
"By the Governor:                    "JOHN IRELAND,
      " J. W. BAINES,                      "Governor of Texas.
          " Secretary of State."

The witness being thus qualified, testified, in substance, as he testified on the trial of Carr, *supra.*

T. J. Ponton testified, for the State, that in 1883 he was the district attorney for the district which includes the county of Guadalupe. Witness prosecuted the witness Darnell to conviction for a felony at the November term, 1883, of the Guadalupe county district court. Darnell had never been convicted of another felony in the witness's district during the witness's incumbency of the office of district attorney, and the felony for which the witness, as district attorney, convicted him at the November term, 1883, of the Guadalupe county district court, was the conviction intended to be covered by the pardon extended by the Governor. Darnell was convicted of an aggravated assault in Gonzales county, in January, 1884, on an indictment for assault with intent to murder. Witness was informed that John Hester had confessed his complicity in the Brown & Peebles burglary, and went to the penitentiary to see him. He told Hester that he had understood he desired to make a statement about the burglary. He made the statement and sheriff Jones wrote it down. Witness then told Hester that he was a very material witness for the State in the burglary case, and that he, witness, would try to get him pardoned. Witness made Hester no promises in this connection, but remarked that he would do what he could toward securing a pardon.

Cross-examined, the witness testified that sheriff Jones, on his first visit to Hester at the penitentiary, took with him some interrogatories addressed to Hester in writing by district attorney Spooner. Witness was then induced to go to the penitentiary to see Hester. Witness promised Hester to do what he could for him, in the cases still pending against him, and intended to carry out that promise. He made the same promise to Darnell. The case pending against Darnell in the Gonzales county district court was dismissed after Darnell testified in this case the first time.

T. H. Spooner testified, for the State, that he had been district attorney since 1884. He had not talked with Hester about dismissing the cases against him, nor had he authorized any body else to do so for him.

Cross-examined, the witness testified that he dismissed the case against Darnell at the last term of court, after Darnell had testified in this case. He did not recollect stating to the court

that the cases against Swann and Darnell were dismissed in consideration of their services in the cases growing out of the Brown & Peebles burglary, though, in fact, such was the reason the said cases were dismissed. The witness stated, at this term of the court, that the cases against Hester were continued by agreement. Witness made that agreement with Hester himself, and not with Messrs. Fly & Davidson and W. S. Fly, his attorneys.

James F. Collins testified, for the State, that he (witness) and the defendant, Bob Carr and John Hester broke into and robbed Brown & Peebles's safe. Witness was at home a part of the time on the day before the robbery, and a part of the time he was in an old house in Murray's pasture, gambling. W. E. Swann, John Hester, defendant, Bob Harvey, Jim Ledbetter, Mitch Carpenter, Goode Trammell and witness participated in the gambling. Carr came to the old house in which the game was being played, during the evening. The house in which the game was played was a little off a direct line between witness's house and Leesville. Goode Trammell did not go with witness to that house, but went with witness to Leesville to replenish the bottle when the whisky gave out. The project to rob Brown & Peebles's store was not mentioned during the game. The project to rob the safe was discussed by witness and others a month before the burglary took place, but Hester, at that time, was not a party to the agreement. The actual agreement to perpetrate the robbery was entered into on the Friday or Saturday before it was committed, by witness, defendant, Orrie Martin and Bob Carr. Carr, defendant, Trammell and Hester were at the witness's house on the night of the robbery. Trammell left witness's house soon after supper. The defendant was somewhat sick that night. Hester, Carr, defendant and witness left witness's house at twelve o'clock on that night to perpetrate the burglary. Hester and Carr went to Leesville in advance of witness and defendant, and when the two latter arrived they found Hester and Carr awaiting them with a crowbar. Carr pried a plank from the side of Brown & Peebles's store, went in and opened a door, and admitted witness and the other two parties named. The parties then went to Billie Brown's, across the creek, and got a wagon on which they mounted the safe. The safe fell off the wagon, and was then taken into the street in front of Willis's store and robbed, a hole being beaten into it

with an axe which was secured by Hester and Carr. The witness sat on Carr's horse to guard the south approach, and defendant sat on Hester's horse to guard the north approach. Unless a miscount was made, about fourteen hundred dollars was secured. The witness and defendant then dragged the wagon to a point beyond Yeager's store. Hester and Carr then carried the crowbar back to old man Carr's house, where they got it, and the four parties met at the mouth of a small branch, about a half mile southeast of Leesburg, whence they went to some timber on the side of a rocky hill and there divided the money. Each of the parties secured about three hundred and fifty dollars, in gold, silver and greenbacks. The paper money was found in a book which the parties burned. The gold and silver were in sacks. A pair of ear rings, said by Carr to belong to Mrs. Brown, was found in a small pocket book. Witness burned the pocket book and ear rings. Hester, who rode witness's saddle to the place of the burglary, went back to witness's house, exchanged it for his own, and "rolled out." The night on which the burglary was perpetrated was an exceedingly severe and stormy one. Witness saw no one astir, but, for a short time while the safe was being rifled, saw a light in Brown's house.

Cross-examined, the witness testified that, according to his recollection, he spent the entire forenoon of the day of the robbery, at home. He had no recollection of going to Leesville on that morning, meeting Hester and Carr in Smith's saloon, and discussing the proposed robbery with them. Witness first saw Trammell on that day in the saloon when he, witness, went to get a fresh supply of whisky for the parties gambling at the old house in the pasture. Witness, according to his best recollection, went alone to the place of gambling, in the first instance. If Hester went with him, he could not remember it. Witness, defendant, Hester and Carr, started to Leesville to commit the burglary, about midnight, when they thought everybody was asleep. It was a bitterly cold night, and the prevailing wind was the severest the witness had ever experienced. Defendant was drunk and sick, and went to bed, where he remained through the first part of the night. Witness's wife was sick—threatened, the witness thought, with miscarriage. At all events, she was confined about a month later. Dave McNabb came to the witness's house, and was answered by witness's wife, just before the parties started to Leesville to rob the store. Witness went to the

gate to meet McNabb.  Hester and Carr went to Leesville in ad-
vance of witness and defendant.  Witness and defendant had
not reached Leesville when Hester and Carr got there with the
crowbar, and the witness thought that the latter parties had the
plank off the side of the house when he and defendant joined
them.  Carr and Hester first went after the wagon.  It was the
recollection of the witness that he and defendant rode up to the
church, tied their horses, and helped to uncouple the wagon.
Witness rode one horse, and led the other back, and the others
then dragged the front wheels of the wagon to the store.  The
money was divided by assorting to each five dollars, ten dollars,
twenty dollars and so on, until each had equal amounts.

From the point where he was on guard, the witness several
times rode up to the safe, and each time found Carr at work on
the safe, and Hester standing near with a pistol in his hand.
Witness did not touch the safe while it was being robbed.  Hes-
ter and Carr took the money from the safe.  Defendant got off
his horse once while the money was being removed.  Witness
did not remember at what exact time he saw the light in Brown's
house, but it was his impression that it was while he was at the
safe, but before it was rolled to the middle of the street.  Wit-
ness was not drunk, nor did he think that any of the parties
were drunk at the time of the robbery.  Witness did not see the
defendant take any money from the safe, but he had a book of
greenbacks at the place of division.  Hester and Carr took the
gold and silver to that point.  Witness handled none of the
money until his share was assigned him at the division.  The
currency was in bills from five to one hundred dollars in denom-
ination.  Witness did not know how many one hundred dollar
bills there were, but he and defendant got one each.  Witness
had confidence in his associates, and did not scrutinize the divi-
sion closely.  Witness had no understanding to the effect that
he would be pardoned if he testified in this case.  Witness sent
for Joe Murray while in confinement, told Murray all about the
robbery, and that he intended to plead guilty.  Witness had been
promised nothing for testifying, but had told good citizens that
he would appreciate anything they would do for him.  Witness
had so stated to sheriff Jones, justice of the peace Ballard, Mr.
Murray and Mr. Littlefield.  None of the parties named had
promised to sign a petition for the witness to be pardoned.  Wit-
ness was not positive that he and defendant were at the store

when the plank was removed, but they were there when the door was opened. While at the fire dividing the money, Carr said that his arm was cut. Witness, at the last term of the court, told Mr. Struman that he was not guilty, but did not say that he would die and go to hell before he would plead guilty.

Wallace Carr testified, for the defense, that his term of service as a clerk in Brown & Peebles's store expired on December 31, 1883, the day of the burglary. Robert Carr and witness were brothers. Witness described the safe robbed, and testified that James F. Collins's reputation for truth and veracity was bad. Rumor connected witness's brother, Robert Carr, with the burglary, and. as witness heard it stated that blood was found on the safe, he examined his brother's arms for wounds. This was on the second day after the burglary. There was not even a scratch on either of Robert Carr's arms. In reply to a question by the court, witness stated that he knew what was in the safe. Witness's term of service as clerk in the store of Brown & Peebles expired on the day of the night of the burglary. Witness was at home sick on that night.

John Mayfield testified, for the defense, that the reputation of the witness Collins for truth and veracity was bad. Bob Carr and Orrie Martin were at witness's house about dark on the evening of the burglary. They separated at witness's house, and Carr went off towards Collins's house.

C. C. Guppy testified, for the defense, that he served on the jury at the former trial of this case. S. H. Brown testified on that trial that the currency in the safe at the time of the robbery included no one hundred dollar bills. Hester testified that five or six one hundred dollar bills were taken from the safe. The Reverend Mr. Killough testified to the same effect.

J. G. McNemar, A. J. Darnell and W. E. Swann testified, for the defense, that the reputation of the witness Collins for truth and veracity was bad.

The motion for new trial raised the questions discussed in the opinion.

*Fly, Davidson & Davidson,* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   I.   An indictment similar to the one in this case was passed upon by this court in Carr v. The State, 19 Texas Court of Appeals, 635, and was held to be sufficient.   The questions now presented upon the indictment were in that case fully discussed, and, without repeating the discussion, we adhere to that decision, and hold that the exceptions to the indictment in this case were properly overruled.

II.   Defendant's application for change of venue was based upon both the statutory grounds, and was in due form of law. (Code Crim. Proc., Art. 578.)   It was controverted in the manner required by law, by affidavits attacking the means of knowledge of the compurgators.   We understand the affidavits to question the means of knowledge of the compurgators as to both of the alleged grounds of the application.   The issue thus formed was tried by the court upon evidence adduced by both parties.   As to the existence of the grounds of the application, the evidence is conflicting, and it was shown on the part of the State that the means of knowledge of the compurgators, especially two of them, as to the existence of said grounds, were quite limited, being confined to hearsay and to their knowledge of the sentiment of the people in one particular neighborhood with regard to the case.   We can not say that the court erred in its judgment refusing the change of venue.   The granting or refusing the application rested in the sound discretion of the trial court, and on appeal the action of said court upon such application will not be revised, unless it should appear that said discretion has been abused.   (Grissom v. The State, 8 Texas Ct. App., 386; Myers v. The State, Id., 321; Magee v. The State, 14 Texas Ct. App., 366.) It does not appear that there has been an abuse of such discretion in this instance.   In all respects the procedure upon the application has been regular, and the evidence admitted upon the issues formed was competent under the decisions of this court. (Carr v. The State, 19 Texas Ct. App., 635; Davis v. The State, Id., 201.)

III.   When the State's witness, Hester, was placed upon the stand to testify, the defendant objected to his competency, upon the ground that he had been convicted in this State of a felony, and in support of said objection produced a judgment and sentence of the district court of Gonzales county, showing that said Hester had been duly convicted in said court, on July 5, 1884, of the theft of sheep of over twenty dollars in value, and sentenced

to confinement in the penitentiary for said offense for the period of five years.  In reply to the objection, the State produced a pardon, signed by the Governor and attested by the seal of the State, pardoning John G. Hester of the offense of theft of sheep, reciting that said Hester had been convicted of said offense at the November term, 1884, of the district court of Gonzales county.  Defendant objected to this pardon upon the ground that the date of the conviction as therein recited did not correspond with the date of the conviction as shown by the judgment and sentence; and because the date of conviction stated in the pardon was a date when there could not have been a term of the district court in Gonzales county.  The witness was held competent, was permitted to testify in the cause, and the defendant excepted.

Upon this question Mr. Bishop says: "In the absence of fraud a pardon will be good, though it states the date of the conviction incorrectly, if it was intended to cover, and does cover, the particular offense." (1 Bish. Cr. Law, sec. 906, citing Com. v. Ohio and Pa. R. R., 1 Grant., Pa., 329.) In Hunnicut v. The State, 18 Texas Court of Appeals, 499, this court cited and adopted the above quoted text of the distinguished author.  That the date of the conviction as recited in the pardon is a date upon which such conviction could not legally have been had, would not, we think, change the rule.  It is in any case a question of identity, the question being was the pardon intended to cover, and does it in fact cover, the particular offense of which the defendant was convicted?  In determining this question the court is not confined to the record alone, but may hear evidence *dehors* the record.  It is a question relating to the competency of the person to testify as a witness, and its determination is confined exclusively to the trial judge.  It is not shown by the bill of exception, or in any other way by the record, that the State failed to prove that the Hester named in the pardon was the same Hester named in the judgment of conviction, and that the conviction named in the pardon was the same conviction evidenced by the judgment. We must therefore presume that such proof was made, to the satisfaction of the trial judge.  We hold, therefore, that the objections to the pardon, upon the ground of variance between its recitals and the judgment of conviction, is not maintainable.

IV.  It was further objected to the pardon that it was granted to avoid a decision of this court, wherein we held that a former

pardon granted said Hester did not restore his competency as a witness, because it was a conditional and not a full pardon. With the reasons which actuated the executive to grant the pardon the courts have no concern. The Constitution clothes him with the power to grant pardons, and this power is beyond the control, or even the legitimate criticism, of the judiciary. Whatever may have been the reasons for granting the pardon, the courts cannot decline to give it effect, if it be valid upon its face. (1 Bish. Cr. Law, secs. 921–926.)

V. That a previous conditional pardon had been granted to and accepted by the witness Hester cannot, we think, affect the validity or effect of the full pardon subsequently granted to and accepted by said witness. We know of no such limitation to the pardoning power. The pardon in question in this case is a full pardon, and had the effect to restore Hester to his competency to testify as a witness. The former pardon in this respect was imperfect, and we can see no good reason why the executive may not grant a further and full pardon, as if no pardon had been previously granted.

VI. Another witness, A. J. Darnell, a convicted felon, who had been pardoned by the Governor, was also permitted, over defendant's objections, to testify in behalf of the State. The same objections are urged to his pardon as to Hester's, and what we have said with regard to Hester's pardon and competency as a witness, is equally applicable to Darnell.

VII. Again, it is urged by defendant's counsel, that public policy forbids the affirmance of a conviction obtained by the means resorted to in this cause to obtain testimony against the defendant. It is shown by the record that the witnesses, Hester and Darnell, were pardoned for the felonies of which they had been convicted, and under which convictions they were serving terms in the penitentiary, that they might testify in behalf of the State against the defendant in this cause. It was further shown that Hester was a principal in the crime for which the defendant was in this case being prosecuted, and that Darnell was probably an accomplice in the same crime. It may be that it is contrary to a sound public policy to pardon convicted felons in order to use them as witnesses to convict supposed offenders. It is not for this court to determine that question. Our function is to decide what the law is, not what it ought to be; to decide what a pardon is, and its effect, not when or for what reasons or

purposes it should be granted. Says that great jurist and author, Mr. Cooley: " Where, by the Constitution, a particular question is plainly addressed to the discretion or judgment of some one department or officer, the interference of any other department or officer, with a view to the substitution of its own discretion or judgment in the place of that to which the Constitution has confided the decision, would be impertinent and intrusive." (Cooley's Const. Lim., secs. 51, 52.) It would be impertinent and intrusive on the part of this court to attempt to control, or even to question the action of the executive in the matter of pardons; and it would be equally impertinent and intrusive on the part of the executive to attempt to substitute his judgment for a decision of a court upon a question within its jurisdiction. Such assumption and interference is expressly interdicted also by our Constitution. (Const., Art. 2, sec. 1.)

In the case under consideration the pardons are valid, and by virtue thereof, under the law, the witnesses were competent, and there was no error in permitting them to testify.

VIII. There is no error in the charge of the court. It is full, clear and correct upon every issue and phase presented by the evidence; and in so far as the special instructions requested and refused were correct and applicable, they are contained in the charge given.

IX. There remains but one question to be determined, and that is the sufficiency of the evidence to support the conviction. Two of the State's witnesses, Hester and Collins, testified that they participated in, and were principles with the defendant in the commission of the burglary and theft. Darnell, another State's witness, was shown, we think, to be an accomplice within the meaning of the statute relating to accomplice testimony. It is by the testimony alone of these three witnesses that the guilt of the defendant is directly established. Such testimony, unless corroborated by other evidence tending to connect the defendant with the offense committed, will not sustain the conviction. Has such corroboration been furnished by the State? The jury and the learned trial judge have answered this question in the affirmative, and after a thorough examination and careful consideration of the evidence, we have reached the same conclusion. Defendant was absent from home on the evening and during the night of the day on which the crime was committed. He was, during this absence from home, in the immediate vicinity

of the place of the crime, and in company with those who testify to their own and to his guilt of the crime. After the commission of the offense, while in an oyster ·saloon in company with a friend, Brown, one of the victims of the crime, entered the saloon, and defendant was asked by his friend if that man, meaning Brown, was one of the men whose safe *they* had robbed. Defendant made no reply to this question except to laugh. These circumstances, though trivial, and of themselves by no means convincing, are nevertheless corroborative, and tend to connect the defendant with the offense committed, and this is all that the law requires to warrant a conviction upon accomplice testimony. We must hold that the evidence is legally sufficient to sustain the conviction. The judgment is affirmed.

*Affirmed.*

Opinion delivered March 10, 1886.